

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00492-CV

ANTHONY ALDRIDGE                                              APPELLANT

V.

THRIFT FINANCIAL MARKETING, LLC                    APPELLEE

----------

## FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. Introduction

Appellant Anthony Aldridge appeals from the trial court's denial of his motion to compel arbitration in a suit brought against him and others by Appellee Thrift Financial Marketing, LLC (Thrift), a Delaware Limited Liability Company. Aldridge, a former "Member" of Thrift, contends that, pursuant to an arbitration agreement contained in the formation agreement creating Thrift, he may compel arbitration of the claims asserted against him by Thrift because those claims

arise from acts he allegedly undertook while still a Member of Thrift. Because the Agreement excludes former Members from the class of persons entitled to compel arbitration, we affirm the trial court's order.

## II. Background

Aldridge and Sue Harvison formed Thrift in 2008 when they entered into the Limited Liability Company Agreement of Thrift Financial Marketing, LLC (Company Agreement). From Thrift's inception through September 30, 2011, Harvison and Aldridge, who executed the Company Agreement as the "initial Members of the Company," were also Thrift's only two Managers as well as its only two Members.

The Company Agreement, which contains the operative provisions for management, membership rights, and other matters pertaining to the governance and operation of Thrift, also contains an arbitration agreement that states in relevant part as follows:

> (b) In the event of the existence of a dispute or disagreement arising out of, or relating to, the formation, interpretation, performance or breach of any Transaction Documents or any amendment or other modification thereto, *any Member or Members* (each a **"*Disputing Member*"**) may submit its basis for such dispute or disagreement in writing *to the other Member or Members* and such other Member or Members (the **"*Responding Members*"**) shall respond in writing to such written notice within 14 days after receiving the written notice. . . .

> (c) If any dispute shall not have been resolved through the use of the procedures specified in paragraph (b) within 30 days after the initial written submission of the issue by a Disputing Member to the Responding Members, then the dispute shall, unless the Disputing Member and Responding Members otherwise agree, be submitted to

and settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, now in effect, except to the extent modified herein. . . . [Emphasis added.]

The Company Agreement expressly defines "Member" as follows:

> **"Member"** means any Person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a member as provided in this Agreement, but such term "*excludes any Person who has ceased to be a Member*." [Emphasis added.]

As alleged in the parties' pleadings and set forth in affidavits, Harvison and Aldridge formed Thrift to handle leads provided to it by Cendera Funding, Inc. (Cendera), a lending company for residential mortgage loans. Thrift's business plan contemplated the use of a call center owned and operated by Thrift, to refine and solicit such leads for Cendera from raw data provided to Thrift by Cendera. According to Thrift, its call center operations allowed it to identify the most promising prospective customers seeking mortgage loans on single-family residences, who would then be referred to Cendera loan officers. Effective September 30, 2008, shortly after Thrift had been formed, Thrift and Cendera entered into a marketing service agreement that provided for Thrift to handle the leads and payment by Cendera for Thrift's services and for Cendera to recruit and train loan officers to be employed by Cendera but located at Thrift's offices. When Thrift received the leads, Thrift personnel would call the potential borrower and invite that person to speak to one of Cendera's loan officers. If the lead matured into a loan, Cendera paid Thrift.

Aldridge, a licensed mortgage banker, became employed as a loan officer for Cendera and recruited other loan officers to be employed by Cendera and to work from Thrift's offices. According to Aldridge, Thrift was aware of and consented to Aldridge's employment with Cendera, and Cendera was aware of and consented to Aldridge's relationship with Thrift.

Thrift contends that, by late spring of 2011, profits derived from Cendera's branch office at Thrift's offices had increased dramatically; Thrift contends that Brian Collins[1] proposed a joint venture with Thrift that promised greater profits and that Thrift and Cendera equally shared profits pursuant to that joint venture from early Summer 2011 through September 30, 2011. Aldridge contends that changes to the agreement were necessary to bring it into compliance with new laws and regulations and that Thrift and Cendera "could not reach a resolution" about necessary changes "after much effort and discussion." Aldridge resigned as a member and manager of Thrift effective September 30, 2011, and relinquished all membership interest in Thrift. Aldridge's letter of resignation, addressed to Harvison, also referenced a "dissolution" of the marketing services agreement between Thrift and Cendera, to which Harvison responded on the same date with a vigorous objection that Aldridge had no authority to dissolve the agreement between Thrift and Cendera.

---

[1]Brian Collins is identified in documents contained in the clerk's record as the President and CEO of Cendera.

On October 6, 2011, Thrift filed this lawsuit against Aldridge, Cendera, and Collins,[2] asserting against Aldridge various claims for debt, liability under the Texas Theft Liability Act, and breaches of fiduciary duty and seeking damages, forfeiture of profits, and establishment of a constructive trust. Aldridge filed a motion to compel arbitration, and Thrift filed a response. The trial court denied Aldridge's motion to compel arbitration after a hearing, and this interlocutory appeal followed.[3]

## III. Discussion

Aldridge raises three issues. He argues generally in his first issue that the trial court erred when it refused to compel arbitration. He contends in his second issue that Thrift may be compelled to arbitrate pursuant to the arbitration provision in the Company Agreement even though Thrift itself is a nonsignatory to that agreement, and he asserts in his third issue that, although he is no longer a Member of Thrift, he may nevertheless compel arbitration pursuant to the Company Agreement because Thrift's claims arise from conduct that allegedly occurred while he was still a Member. We address Aldridge's third issue first.

---

[2]Thrift alleges that Collins knowingly participated in Aldridge's and Cendera's breaches of fiduciary duty against Thrift.

[3]Cendera and Collins filed a motion adopting Aldridge's motion to compel arbitration but have not appealed the trial court's denial of their motion.

## A. Applicable Law

The parties agree that the Federal Arbitration Act (FAA) applies to this proceeding.  *See* 9 U.S.C.A. §§ 1–16 (West 2009).  Section 51.016 of the Texas Civil Practice and Remedies Code permits the interlocutory appeal of an order denying a motion to compel arbitration under the FAA.  Tex. Civ. Prac. & Rem. Code Ann. § 51.016 (West Supp. 2012).

The FAA provides, in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "The FAA reflects the fundamental principle that arbitration is a matter of contract."  *Rent–A–Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010).  Section 2 of the FAA has been described as reflecting both a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (citing *Rent–A–Center*, 130 S. Ct. at 2776; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983)).  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."  *Rent–A–Center*, 130 S. Ct. at 2776 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S. Ct. 1204, 1207 (2006), and *Volt Info. Scis., Inc. v. Bd.*

*of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S. Ct. 1248, 1255 (1989)).

The Company Agreement contains a choice-of-law provision that states that it is to be "governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law principles." Although Thrift cites a few Delaware cases in its brief, it also asserts that "Delaware and Texas law regarding arbitration do not conflict" and that "Delaware and Texas law on contract construction principles are essentially identical and do not conflict." Aldridge relies on Federal and Texas case law, and he does not point to any conflict between Texas and Delaware law. "As there appears to be no conflict of laws, 'there can be no harm in applying Texas law.'" *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (orig. proceeding) (per curiam) (quoting *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex. 2004)); *see also In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 550 (Tex. 2002) (orig. proceeding) (per curiam). We thus apply Texas law.

A trial court's determination regarding the validity of an agreement to arbitrate is a question of law which we review de novo.[4] *J.M. Davidson, Inc. v.*

---

[4]"Under the FAA, absent unmistakable evidence that the parties intended the contrary, it is the courts rather than arbitrators that must decide 'gateway matters' such as whether a valid arbitration agreement exists." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding) (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S. Ct. 2402, 2407 (2003), and *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 n.2, 123 S. Ct. 1531, 1536 n.2 (2003)).

*Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *see GM Oil Props., Inc. v. Wade,* No. 01-08-00757-CV, 2012 WL 246041, at \*5 (Tex. App.—Houston [1st Dist.] Jan. 26, 2012, no pet.) (mem. op.) (recognizing whether an enforceable arbitration agreement exists is a question of law for court to review de novo); *Schlumberger Tech. Corp. v. Baker Hughes Inc.,* 355 S.W.3d 791, 800 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("When an appeal from a denial of a motion to compel arbitration turns on a legal determination . . . we apply a de novo standard.") (citing *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 55 n.9 (Tex. 2008)).

Under the FAA, a party seeking to compel arbitration must satisfy a two-pronged burden of proof in that it must first demonstrate the existence of a valid agreement to arbitrate the dispute and then prove that the claims asserted are within the scope of the agreement. *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding) (per curiam); *AdvancePCS Health L.P.*, 172 S.W.3d at 605. If the party seeking arbitration carries its initial burden, the burden shifts to the opposite party to present evidence of an affirmative defense. *AdvancePCS Health L.P.*, 172 S.W.3d at 607.

An agreement to arbitrate is a contract, the relation of the parties is contractual, and the rights and liabilities of the parties are controlled by the law of contracts. *See AT&T Mobility LLC,* 131 S. Ct. at 1748–49, 1752–53 (arbitration is a creature of contract; a person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner which, he has agreed to do so). Since

8

arbitration is generally a matter of contract, the FAA requires courts to honor parties' expectations. 9 U.S.C.A. § 1 *et seq.; AT&T Mobility LLC,* 131 S. Ct. at 1752–53; *In re Bunzl USA, Inc.,* 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding) ("[A] party cannot be compelled to arbitrate a dispute unless he has agreed to do so.").

When deciding whether parties agreed to arbitrate, courts should apply ordinary state law principles regarding the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924 (1995); *J.M. Davidson*, 128 S.W.3d at 227–28; *see Weekley Homes, L.P.*, 180 S.W.3d at 130 ("Generally under the FAA, state law governs whether a litigant agreed to arbitrate."). In conducting our review, we "may not expand upon the terms of the contract or tolerate a liberal interpretation of it by reading into it a voluntary, consensual agreement to arbitrate when one otherwise does not exist." *In re Bates*, 177 S.W.3d 419, 422 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding). "Although an arbitration agreement does not have to assume any particular form, the language of the agreement must clearly indicate the intent to arbitrate." *Id.* Additionally, in resolving disputes regarding interpretation of an arbitration agreement, we apply standard principles of contract interpretation and construction. *Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 636 (Tex. App.—Waco 2003, no pet.). The plain meaning of the contractual language should be looked to in order to ascertain the intent of the parties. *Id.*

## B. Application

Aldridge contends that he has a right under the Company Agreement to compel arbitration of Thrift's claims against him, contrary to Thrift's argument in the trial court that, because he is no longer a member of Thrift, he can no longer compel arbitration. Aldridge acknowledges that he voluntarily relinquished his position and resigned as a Member of Thrift before Thrift filed this lawsuit and before he filed his motion to compel arbitration. But he argues that his resignation does not prevent him from compelling arbitration of Thrift's claims now because there is no dispute that Thrift's claims are based on acts that allegedly occurred while Aldridge was a Member and Manager of Thrift. Aldridge characterizes Thrift's argument as "nothing more than the Company Agreement is written in the present tense" and argues that nothing in the Company Agreement "prohibits or divests" a former Member from seeking arbitration of disputes arising from or relating to acts taken by that individual while he was a Member.

The agreement to arbitrate provides that "*any Member or Members* (each a '***Disputing Member***') may submit its basis for such dispute or disagreement in writing to *the other Member or Members*" and that if the dispute or disagreement is not resolved "within 30 days after the initial written submission of the issue by a Disputing Member to the Responding Members, then the dispute shall, unless the Disputing Member and Responding Members otherwise agree, be submitted to and settled by arbitration." [Emphasis added.] Although that provision is, as

10

Aldridge points out, written in the present tense, we agree with Thrift that the repeated use of the terms "Member," "Disputing Member," and "Responding Member" demonstrates that the agreement to arbitrate is an agreement solely regarding resolution of disputes between "Members" of Thrift. Moreover, we disagree with Aldridge's contention that nothing in the Company Agreement prevents or divests a former Member from seeking arbitration.

To the contrary, and regardless of whether the alleged conduct occurred or the dispute arose while a person was a Member, the definition of the term "Member" set forth in the Company Agreement expressly "excludes any Person *who has ceased to be a Member.*" [Emphasis added.] That definition is contained in a list of defined terms in a preceding section of the contract that provides that "[w]hen used in this [Company] Agreement, the following terms shall have the respective meanings assigned to them . . . ."

When contracting parties have set forth their own definitions of terms they employ, courts are not at liberty to disregard such definitions and substitute other meanings. *AMS Constr. Co. v. K.H.K. Scaffolding Houston, Inc.*, 357 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd); *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.); *Alexander v. Cooper*, 843 S.W.2d 644, 646–47 (Tex. App.—Corpus Christi 1992, no writ); *Hart v. Traders & Gen. Ins. Co.*, 487 S.W.2d 415, 417–18 (Tex. Civ. App.—Fort Worth 1972, writ ref'd n.r.e.). Reading the arbitration provision together with the Company Agreement's definition of "Member," the

11

Company Agreement is specific that a person who has ceased to be a Member is not a "Member." Thus, only an existing Member of Thrift may invoke the informal resolution and resulting arbitration provisions against another current Member. *See Dillard Dep't Stores*, 186 S.W.3d at 515 (stating that the "objective intent as expressed in the agreement controls the construction of an unambiguous contract"); *Bates*, 177 S.W.3d at 422 (stating that "the language of the [arbitration] agreement must clearly indicate the intent to arbitrate").

Aldridge does not directly address the exclusion of former Members from the definition of "Member" in the Company Agreement. His response is that he may nevertheless compel arbitration because "an arbitration agreement contained within a contract survives the termination or repudiation of the contract as a whole" and that his alleged acts occurred while he was still a Member of Thrift. Aldridge supports his argument by citing several cases. *See Ambulance Billings Sys., Inc. v. Gemini Ambulance Servs., Inc.*, 103 S.W.3d 507, 512–14 (Tex. App.—San Antonio 2003, no pet.); *In re Koch Indus., Inc.*, 49 S.W.3d 439, 445 (Tex. App.—San Antonio 2001, orig. proceeding); *Henry v. Gonzalez*, 18 S.W.3d 684, 690 (Tex. App.—San Antonio 2000, pet. dism'd by agr.); *Dallas Cardiology Assocs., P.A. v. Mallick*, 978 S.W.2d 209, 213 (Tex. App.—Texarkana 1998, pet. denied); *Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 932 (Tex. App.—Houston [1st Dist.] 1996, no writ); *Miller v. Puritan Fashions Corp.*, 516 S.W.2d 234, 238 (Tex. Civ. App.—Waco 1974, writ ref'd n.r.e.).

Those cases are distinguishable for at least two reasons. First, the issue in those cases involved whether an abandonment, repudiation, or termination of the contract containing an arbitration provision rendered the arbitration provision unenforceable. *See Ambulance Billings Sys., Inc.*, 103 S.W.3d at 510, 512–14 (involving whether settlement agreement of contract dispute rendered arbitration agreement no longer in effect); *Koch Indus., Inc.*, 49 S.W.3d at 444–45 (opposing parties contended arbitration provision was unenforceable because easement had been abandoned); *Henry*, 18 S.W.3d at 690 (involving issue of whether termination of attorney-client contract also terminated arbitration clause); *Dallas Cardiology*, 978 S.W.2d at 213 (finding any potential breach of contract did not render arbitration clause unenforceable); *Pepe Int'l*, 915 S.W.2d at 932 (holding cancellation of underlying contracts did not invalidate arbitration clauses).[5]

Secondly, none of those cases involved provisions like that in the Company Agreement that expressly excludes a former Member from the definition of "Member[s]" who are entitled to invoke the arbitration provision. Even though an arbitration provision survives termination of the contract containing it, *see Henry*, 18 S.W.3d at 690, this case is unique because the

---

[5]Moreover, the termination, repudiation, abandonment, and breach issues involved in those cases dealt with the merits of the respective parties' claims and defenses (as opposed to termination of the arbitration clause itself), and those were held to be issues for an arbitrator rather than the court. *See Ambulance Billings Sys., Inc.*, 103 S.W.3d at 512–14; *Koch Indus., Inc.*, 49 S.W.3d at 445; *Henry*, 18 S.W.3d at 690; *Dallas Cardiology*, 978 S.W.2d at 213; *Pepe Int'l*, 915 S.W.2d at 932; *Miller*, 516 S.W.2d at 238.

13

express language of the arbitration provision limits its application to disputes or disagreements between "Members" and because the Company Agreement expressly defines "Member" to exclude any person "who has ceased to be a Member." Considering the enforceability of the arbitration provision alone, *see Koch Indus., Inc.*, 49 S.W.3d at 445, Aldridge has not met his burden of presenting a valid agreement to arbitrate between himself and Thrift because the express language of the Company Agreement excludes former Members from those entitled to compel arbitration and because Aldridge voluntarily resigned as a Member of Thrift. *See AdvancePCS Health L.P.*, 172 S.W.3d at 607 (discussing shifting burdens under FAA); *see also AT&T Mobility LLC*, 131 S. Ct. at 1752–53 (stating that the FAA requires courts to honor the parties' expectations); *Dillard Dep't Stores*, 186 S.W.3d at 515 (stating that the parties' intent as shown by the unambiguous agreement controls); *Bates*, 177 S.W.3d at 422 (stating that reviewing courts may not read an agreement to arbitrate into a contract "when one otherwise does not exist" and that the contract must clearly indicate the intent to arbitrate).

We hold that the trial court did not err by denying Aldridge's motion to compel arbitration because Aldridge does not have the contractual right under the Company Agreement to compel arbitration of Thrift's claims against him. We therefore overrule Aldridge's third issue.

14

## C. Aldridge's Remaining Issues

Aldridge contends in his second issue that Thrift may be compelled to arbitrate its claims even though it did not separately sign the Company Agreement. Within his second issue, Aldridge argues that Thrift's claims in this lawsuit are subject to arbitration because Thrift is bound by the Company Agreement; because Thrift artfully pleaded claims actually belonging to Harvison, the only remaining Member of Thrift, in an attempt to avoid arbitration; because direct benefits estoppel requires arbitration of Thrift's claims; and because Thrift's claims fall within the scope of the arbitration provision.

Those remaining arguments, however, each assume that Aldridge has the contractual right under the Company Agreement to compel arbitration. Because we have held above that Aldridge does not have a right to compel arbitration given the express contractual language and his voluntary resignation as a Member, that issue is dispositive of the appeal, and it is unnecessary for us to reach Aldridge's first or second issue. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that . . . addresses every issue raised and necessary to final disposition of the appeal.").

## IV. Conclusion

Having overruled Aldridge's third issue, and finding it unnecessary to reach his general first issue or his second issue, we affirm the trial court's order denying Aldridge's motion to compel arbitration.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

DELIVERED:  August 2, 2012

16