02-12-196-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00196-CV

 

 


 
 
 New
 Hampshire Insurance Company
  
 v.
  
 Magellan
 Reinsurance Company, Ltd.
 
 
 §
  
 §
  
 §
  
 §
 
 
 From the 236th District
 Court
  
 of
 Tarrant County (236-213761-05)
  
 February
 14, 2013
  
 Opinion
 by Justice Meier
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s order.  It is ordered that the order of the trial
court is affirmed.

          It
is further ordered that Appellant New Hampshire Insurance Company shall pay all
costs of this appeal, for which let execution issue.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Bill Meier

 

 

 

 








 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00196-CV

 

 


 
 
 New Hampshire Insurance Company
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Magellan Reinsurance Company, Ltd.
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE 236th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          The
litigation between Appellant New Hampshire Insurance Company and Appellee
Magellan Reinsurance Company, Ltd. has been lengthy, vigorously contested, and
well traveled.  It began in 2004 in the Turks and Caicos Islands (TCI), included
brief proceedings in New York, and is now—eight years later, yet still in its
infancy—ongoing in Texas.  While the essence of the underlying dispute between New
Hampshire and Magellan has remained unchanged since the inception of the litigation,
New Hampshire’s opinion about the arbitrability of the disputed matters has
not.  Because we hold that New Hampshire is judicially estopped from compelling
arbitration, we will affirm the trial court’s order denying New Hampshire’s
motion to compel arbitration.

II.  Factual and Procedural Background

          New
Hampshire is a Pennsylvania corporation that is authorized to conduct business
in Texas.  Magellan is a corporation chartered in the TCI.  Its primary place
of business is Tarrant County, Texas.

          In
1997, New Hampshire and Magellan entered into a “Contractual Reimbursement
Insurance Reinsurance Agreement,” whereby Magellan agreed to accept 100% of New
Hampshire’s obligations and liabilities under a number of automobile dealer insurance
policies issued by New Hampshire in exchange for 100% of the gross written
premiums paid under the policies, less a provisional ceding commission to New
Hampshire.  The Reinsurance Agreement required Magellan to establish a trust
account, from which New Hampshire was authorized to withdraw funds to secure payments
under the Reinsurance Agreement.  The Reinsurance Agreement also contains an
arbitration provision, which provides in relevant part that “[a]ll disputes or
differences arising out of the interpretation of this Agreement shall be
submitted” to arbitration in New York.  [Emphasis added.]

          In
April 2002, New Hampshire made “a series of withdrawals” from the trust account—over
$2 million according to Magellan—“effectively emptying” it.  New Hampshire
subsequently informed Magellan that the trust fund required a deposit of approximately
$1.2 million.  Magellan identified several discrepancies in New Hampshire’s claims
handling and accounting, disagreed that the deposit was necessary, and
requested a refund from New Hampshire in the amount of approximately $995,000. 
New Hampshire and Magellan continued to exchange correspondence over the next
few years—New Hampshire defended its claims handling and accounting and
demanded that Magellan deposit approximately $1.4 million into the trust
account, and Magellan challenged New Hampshire’s claims amounts, demanded to
inspect New Hampshire’s books and records, and refused to deposit the $1.4
million into the trust account.

          Relying
upon the demanded but unpaid $1.4 million and a TCI ordinance related to a
company’s inability to pay a “debt,” New Hampshire filed a petition in August
2004 in a TCI court to “wind up” Magellan’s business.  Magellan responded by
moving to stay the proceedings and to compel arbitration.  New Hampshire argued
against arbitration, contending that the dispute did not involve the
interpretation of the Reinsurance Agreement but only whether Magellan was
insolvent.  The TCI lower court agreed with New Hampshire, declined to compel
arbitration, and ordered Magellan to be wound up.  An appeal reversing the
lower court, a remand, and additional litigation in the TCI courts ensued.

          Meanwhile,
at some point before the TCI lower court issued its final ruling, Magellan
initiated a proceeding in a New York state court to enjoin the TCI litigation
and to compel New Hampshire to arbitration in New York.  New Hampshire contested
the action, arguing that Magellan’s “statutory insolvency” under TCI law was
not a dispute that involved the interpretation of the Reinsurance Agreement.  After
the TCI lower court had ruled, the New York court denied Magellan’s requested
relief, concluding—just like the TCI lower court had—that “[t]he question of
whether [Magellan] owes money is not an interpretation of the reinsurance
contract; rather, it is a factual controversy concerning respondent’s
calculation of the amount in dispute . . . .”

          In
September 2005, while the TCI litigation was still pending, Magellan sued New
Hampshire in Texas and asked the trial court to make nine declarations
regarding the parties’ rights “under the Reinsurance Agreement.”  Magellan
amended its original petition later in September 2005, and with the exception
of two declarations, Magellan asked the trial court to make all of the same
declarations as those pleaded in the original petition.

          In
December 2005, New Hampshire filed a motion to dismiss or abate Magellan’s
Texas action.  New Hampshire argued that the relief was necessary because
“[t]he issues Magellan now asks this Court to decide mirror those raised,
litigated[,] and currently pending in the TCI . . . Action.”
 The trial court abated the Texas action in February 2006 pending resolution of
the TCI litigation.

          The
TCI litigation came to a conclusion in July 2009 when the Lords of the Judicial
Committee of the Privy Council held that New Hampshire was not a “creditor” of
Magellan and, therefore, could not “wind up” Magellan’s business.  Two years
later, in June 2011, the Texas trial court purported to vacate the order
abating the case.

          In
November 2011, New Hampshire, for the first time, moved to compel arbitration
of Magellan’s then-pleaded declaratory judgment claims.  New Hampshire argued
that arbitration was necessary because Magellan had repeatedly admitted as much
in earlier proceedings.  Detailing New Hampshire’s history of contesting
arbitration, Magellan responded that judicial estoppel, judicial admission,
collateral estoppel, and waiver barred New Hampshire from compelling
arbitration of Magellan’s claims.  In December 2011, before the hearing on New
Hampshire’s motion, Magellan filed its second amended petition, removing its
nine requests for declaratory relief and substituting claims against New
Hampshire for breach of contract, fraud, breach of fiduciary duty, conversion,
accounting, and theft under the Texas Theft Liability Act.  The trial court
ultimately denied New Hampshire’s motion to compel arbitration.  This
interlocutory appeal followed.

III.  Prior Dismissal for Want of Prosecution

          Neither
party raises any jurisdictional arguments, but we feel compelled to first address
a procedural matter that was partly the subject of a recent original proceeding
in this court.  On December 30, 2009, the Texas trial court dismissed for
want of prosecution Magellan’s lawsuit against New Hampshire.  Almost fifteen
months later, on March 17, 2011, the trial court vacated its December 30,
2009 dismissal order and reinstated the cause.  New Hampshire later filed a
petition for writ of mandamus, arguing that the trial court lacked plenary
power to reinstate the cause.  See In re New Hampshire Ins. Co., No.
02-12-00281-CV, 2012 WL 3264392, at *1 (Tex. App.—Fort Worth Aug. 13,
2012, orig. proceeding) (mem. op.).  This court agreed with New Hampshire
(notwithstanding that the cause had been abated when the trial court dismissed
it) and conditionally granted the petition.  Id. at *1–2.  Although our holding
meant that the cause was not reinstated in March 2011, Magellan later invoked the
Texas trial court’s subject-matter jurisdiction by filing the second amended
petition in December 2011.  See Leach v. Brown, 156 Tex. 66,
68–69, 292 S.W.2d 329, 330–31 (1956) (holding that the filing of an amended
petition in the same cause in which a final judgment had already been entered
was, like an original petition, sufficient to invoke the trial court’s
jurisdiction).  We therefore observe no jurisdictional impediment to our
consideration of this interlocutory appeal.[2]

IV.  Arbitrability
of Magellan’s Claims

          In
what we construe as a single issue, New Hampshire argues that the trial court
erred by refusing to compel arbitration of the claims pleaded by Magellan in
its second amended petition.  Specifically, New Hampshire contends that the
claims involve the interpretation of the Reinsurance Agreement, that it did not
waive the right to arbitrate any of the claims, and that none of the other
equitable principles cited by Magellan prevent enforcement of the arbitration
provision because the pending claims are separate and distinct from the matters
involved in the TCI and New York litigation.

Magellan responds that its
fraud, breach of fiduciary duty, conversion, theft, and accounting claims are
outside the scope of the arbitration clause because, on their face, they do not
involve the interpretation of the Reinsurance Agreement.  Further, although Magellan
does not dispute that its breach of contract claim is within the scope of the
arbitration agreement, it argues that its former
requests for declaratory relief “essentially morphed” into the breach of
contract claim and that New Hampshire’s request to compel arbitration of the
breach of contract claim is barred by judicial estoppel, judicial admission,
collateral estoppel, and waiver because of New Hampshire’s prior conduct
contesting arbitration in the TCI litigation, the New York proceeding, and the
pre-second amended petition Texas litigation.  To the extent that the
non-breach of contract claims are covered by the arbitration agreement,
Magellan argues that they too are barred on the same grounds.

New Hampshire replies that its
past arguments contesting arbitration are irrelevant and cannot preclude it
from compelling arbitration at this point because the second amended petition
alleges entirely new causes of action, the arbitrability of which New Hampshire
has never argued against.

          A.      Standard
of Review

          We
review the trial court’s denial of a motion to compel arbitration for an abuse
of discretion.  See In re Labatt Food Svc., L.P., 279 S.W.3d
640, 643 (Tex. 2009) (orig. proceeding); Cleveland Constr., Inc. v. Levco
Constr., Inc., 359 S.W.3d 843, 851–52 (Tex. App.—Houston [1st Dist.] 2012,
pet. dism’d) (explaining standards of review for arbitration appeals).  Under
this standard, we defer to the trial court’s factual determinations that are
supported by the record and review legal questions de novo.  Cleveland
Constr., Inc., 359 S.W.3d at 851–52.

          B.      Choice
of Law

          The
Reinsurance Agreement states that it “shall be governed by and construed in
accordance with the laws of the State of New York.”  Although New Hampshire
observes that the Reinsurance Agreement is governed by New York law and cites a
number of New York cases in its briefing, it predominantly relies on Texas
caselaw and has confirmed on several occasions that there is no relevant
distinction between Texas and New York law.  “As there appears to be no
conflict of laws, ‘there can be no harm in applying Texas law.’”  In re
AdvancePCS Health L.P., 172 S.W.3d 603, 606 (Tex. 2005) (orig. proceeding)
(quoting Compaq Computer Corp. v. Lapray, 135 S.W.3d 657, 672 (Tex.
2004)); Aldridge v. Thrift Fin. Mktg., LLC, 376 S.W.3d 877, 882 (Tex.
App.—Fort Worth 2012, no pet.) (reasoning similarly).  We therefore apply Texas
law.

          C.      Magellan’s Non-Breach of Contract
Claims

 

          A
party attempting to compel arbitration must establish a valid arbitration
agreement whose scope includes the claims asserted.[3] 
In re Dillard Dep’t Stores, Inc., 186 S.W.3d 514, 515 (Tex.
2006) (orig. proceeding).  In determining whether a claim falls within the
scope of an arbitration agreement, we focus on the factual allegations of the
complaint, rather than the legal causes of action asserted.  See Jack B.
Anglin Co. v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992).  Any doubts about
whether Magellan’s non-breach of contract claims fall within the scope of the
arbitration agreement must be resolved in favor of arbitration.  Prudential
Sec. Inc. v. Marshall, 909 S.W.2d 896, 899 (Tex. 1995).  The policy in
favor of enforcing arbitration agreements is so compelling that a court should
not deny arbitration unless it can be said with positive assurance that an
arbitration clause is not susceptible of an interpretation that would cover the
dispute at issue.  Id.  If a party establishes a valid arbitration
agreement whose scope includes the claims asserted, the burden shifts to the
party opposing arbitration to prove its defenses to arbitration.  AdvancePCS
Health, L.P., 172 S.W.3d at 607.

          Here,
there is no dispute that a valid arbitration agreement exists.  As for whether
Magellan’s non-breach of contract claims are subject to arbitration, the fraud
claim complains of “words, acts, [and] conducts [by New Hampshire] . . .
which were false.”  The breach of fiduciary duty claim alleges that New
Hampshire “acted in its own best interest and contrary to the interest of
Magellan.”  The conversion claim alleges that in withdrawing trust funds, New
Hampshire “converted property which belonged to Magellan.”  The theft claim
alleges that New Hampshire “unlawfully appropriated or stole the funds
contained in the trust account.”  And the accounting claim alleges that New
Hampshire “should be required to render a full and complete detailed accounting
of all claims and monies paid.”  Thus, to some extent, each of Magellan’s claims
implicates New Hampshire’s duties and responsibilities under the Reinsurance
Agreement.  We therefore cannot conclude with positive assurance that Magellan’s
non-breach of contract claims do not require—or at a minimum, touch upon in
some way—the interpretation of the Reinsurance Agreement.  See, e.g.,
In re FirstMerit Bank, N.A., 52 S.W.3d 749, 754–56 (Tex. 2001)
(compelling arbitration of tort claims related to financing contract); Jack
B. Anglin Co., 842 S.W.2d at 271 (“Although the City’s misrepresentation
claims are grounded in legal theory distinct from its contract claim, they are
factually intertwined, and thus are subject to the arbitration provision of the
contract.”); Hou-Scape, Inc. v. Lloyd, 945 S.W.2d 202, 205–06 (Tex.
App.—Houston [1st Dist.] 1997, orig. proceeding) (holding that tort claims were
arbitrable because they arose out of and were related to contract).  We hold
that Magellan’s fraud, breach of fiduciary duty, conversion, theft, and
accounting claims are within the scope of the arbitration agreement.

          D.      Magellan’s
Defense to Arbitration:  Judicial Estoppel

          Magellan
argues that even if all of its claims are subject to arbitration, New Hampshire
is judicially estopped from compelling arbitration of those claims.  We agree.

          The
doctrine of judicial estoppel precludes a party who successfully maintains a
position in one proceeding from afterwards adopting a clearly inconsistent
position in another proceeding to obtain an unfair advantage.  Ferguson v.
Bldg. Materials Corp. of Am., 295 S.W.3d 642, 643 (Tex. 2009); Pleasant
Glade Assembly of God v. Schubert, 264 S.W.3d 1, 6 (Tex. 2008), cert.
denied, 555 U.S. 1137 (2009).  It is not intended to punish inadvertent
omissions or inconsistencies but rather to prevent parties from playing fast
and loose with the judicial system for their own benefit.  Ferguson, 295
S.W.3d at 643.  As one court has observed, the doctrine’s purpose is “to prohibit
the deliberate shifting of position to suit exigencies of each particular case
that may arise concerning the subject matter in controversy.”  Moore v. Neff,
629 S.W.2d 827, 829 (Tex. App.—Houston [14th Dist.] 1982, writ ref’d n.r.e.).

          The
record demonstrates that Magellan first raised the issue of arbitration at the
outset of the TCI litigation, when it sought to stay those proceedings.  New
Hampshire argued against arbitration and described the dispute as regarding the
“calculation of sums owing,” which according to New Hampshire, did not involve
the interpretation of the Reinsurance Agreement.  The TCI lower court agreed
with New Hampshire and denied Magellan’s request to stay the proceedings for
arbitration.  Thus, in successfully defending against arbitration in the TCI
litigation, New Hampshire convinced the TCI lower court that the scope of the
proceedings there did not involve any interpretation of the Reinsurance
Agreement.

          Magellan
raised the issue of arbitration again in the New York proceeding when it sought
to enjoin the TCI proceedings.  As in the TCI litigation, New Hampshire argued
against arbitration, describing its petition in the TCI action as one that was “not
based upon a dispute regarding the interpretation of the Reinsurance Agreement”
and explaining that “Magellan’s statutory insolvency under” TCI law did not
involve the interpretation of the Reinsurance Agreement.  The New York court
declined to stray from the reasoning of the TCI lower court’s order denying
arbitration and, like the TCI lower court, adopted New Hampshire’s narrow
interpretation of the proceedings, concluding that “[t]he question of whether
petitioner owes money is not an interpretation of the” Reinsurance Agreement.

          In
September 2005, as the TCI litigation progressed, Magellan initiated the Texas
action and sought nine declarations regarding the parties’ rights “under the
Reinsurance Agreement.”  Notwithstanding Magellan’s unambiguous reference
explaining its intent in seeking the declarations (to determine rights “under
the Reinsurance Agreement”), even the most cursory review of the nine
declarations reveals that each indisputably required an interpretation of the
Reinsurance Agreement; they stated,

a.       Whether [New
Hampshire] validly withdrew funds from the trust and whether [New Hampshire] is
obligated to refund amounts previously withdrawn in error from the trust and
the amount of such refund, including interest;

 

b.       Whether the
Reinsurance Agreement allows a deduction for “timing differences”;

 

c.       Whether [New
Hampshire] can withdraw amounts from the Trust without providing supporting
detailed claims documentation that supports the amounts withdrawn;

 

d.       Whether [New
Hampshire] has sole discretion to summarily determine the amount of unearned
premium reserves pursuant to Article IV of the Reinsurance Agreement;

 

e.       the detail
required in the cession statements under Article VII of the Reinsurance
Agreement;

 

f.        Magellan’s
right to audit [New Hampshire’s] books and records under Article XI of the
Reinsurance Agreement; and whether, under Article XI of the Reinsurance
Agreement, Magellan sufficiently disputed the amount [New Hampshire] claims is
owing to the Trust;

 

g.       the identity
of dealers and/or contracts covered by the Reinsurance Agreement;

 

h.       whether,
under Article XI of the Reinsurance Agreement, Magellan’s request to audit [New
Hampshire’s] books and records can be conditioned on Magellan depositing the
amount requested by [New Hampshire] into the Trust, and vice versa; and

 

i.        the correct
and valid amount of the reinsurance claims, if any, by [New Hampshire] against
Magellan.

 

Although
New Hampshire had successfully argued against arbitration by narrowly defining
both the purpose and scope of the proceedings as involving only a
determination of the amount of money owed by Magellan to New Hampshire, when it
sought to dismiss or abate Magellan’s Texas lawsuit, it argued that “[t]he
issues Magellan now asks this Court to decide [which obviously involved an
interpretation of the Reinsurance Agreement] mirror those raised, litigated[,]
and currently pending in the TCI . . . Action.” 
[Emphasis added.]  Indeed, New Hampshire successfully argued,

The central issue in
the TCI lawsuit is whether Magellan should be wound up for its failure to
adequately fund a trust account pursuant to the terms of a reinsurance
agreement between the parties.  Though that precise issue is not presented to
this Court in Magellan’s request for declaratory judgment, all issues
presented are part and parcel of that determination and all concern the
amount of Magellan’s debt to [New Hampshire], an issue that will be addressed
by the liquidator appointed in the TCI Action.  Because all issues in this
subsequently-filed action may be, or currently are, in litigation in the TCI
lawsuit, this Court should dismiss Magellan’s request for declaratory
judgment.  [Emphasis added.]

 

          Thus,
in seeking to dismiss or abate the Texas action, New Hampshire’s interpretation
of the scope of the TCI litigation shifted from its earlier narrow description
of the proceedings as merely involving a determination of the amount of money
owed by Magellan to broadly construing the proceedings to include all of
Magellan’s declarations seeking to interpret multiple parts of the Reinsurance
Agreement.  Notwithstanding this, and perhaps intending to quash any further
attempts by Magellan to compel arbitration in light of New Hampshire’s amended
perception of the scope of the proceedings there, New Hampshire stated in a
footnote in its motion to dismiss or abate that it “denies that there is a
dispute ‘arising out of interpretation of the Reinsurance Agreement,’” a
statement that irreconcilably conflicted with its arguments broadly construing
the scope of the TCI litigation.  New Hampshire subsequently prevailed, just as
it had in the TCI lower court and the New York litigation.

          Several
years later, after the TCI litigation had concluded, New Hampshire moved to
compel arbitration of Magellan’s claims, which at the time were those included
in Magellan’s first amended petition—the nine declarations.  According to New
Hampshire, “a valid arbitration agreement exists that is in writing,
encompasses the subject matter of the dispute, involves transactions in
interstate commerce, and therefore requires arbitration under the FAA.”  Although
Magellan quickly filed its second amended petition, removing the declaration
requests and substituting them with its current claims, New Hampshire’s intent
was clear:  it now wanted to arbitrate Magellan’s claims.

          The
foregoing portions of the record thus show that, regarding the scope of the TCI
and New York litigation as it pertained to the propriety of compelling arbitration,
New Hampshire, to its benefit, maintained a position in the TCI lower court and
the New York proceeding that was inconsistent with its position in the Texas
action.  Now, a number of years later, New Hampshire is attempting to
accomplish a similar feat; it successfully argued against arbitration of
Magellan’s claims in the TCI litigation and the New York proceeding but now
wants to compel arbitration.  The unfair advantage that New Hampshire stands to
gain simply consists of the fruits of shifting position to suit the exigencies
of each particular cause.  See Ferguson, 295 S.W.3d at 643; Moore,
629 S.W.2d at 829.  This is the precise conduct that judicial estoppel is meant
to prohibit.

          New
Hampshire argues that its prior conduct contesting arbitration is irrelevant
because it has never argued that the claims alleged by Magellan in its second
amended petition are not arbitrable.  According to New Hampshire, “Magellan
identifies no case law or other authority . . . holding
that an alleged waiver or estoppel of a party’s right to arbitration applies to
a later-amended complaint alleging entirely new causes of action.”  This is a
compelling argument, but it is ultimately unpersuasive because it relies upon a
hypertechnical perspective of the proceedings that is inconsistent with the
reality of what this dispute has always been, and continues to be, about—both parties’
rights and duties and compliance or noncompliance with one or more terms of the
Reinsurance Agreement.

          When
Magellan filed its original petition in the Texas action, it attached
correspondence between it and New Hampshire dating as far back as 2002.  Even
at this early stage of the dispute, it was apparent that the disagreements
between the parties involved their respective rights and duties under the
Reinsurance Agreement—New Hampshire defended its claims handling and accounting
and demanded that Magellan deposit funds into the trust account, and Magellan
challenged New Hampshire’s claims amounts, demanded to inspect New Hampshire’s
books and records, and refused to deposit additional funds into the trust
account.  The correspondence abounds with references to the Reinsurance
Agreement.

          In
the TCI litigation, New Hampshire convinced the TCI lower court that
arbitration was unnecessary because the dispute involved only the calculation
of money owed by Magellan, an exclusively non-interpretive, factual matter. 
But the record belies this overly narrow characterization; the dispute involved
much more than a simple debt, and Magellan tried to explain this in the TCI
litigation.  Philip Apgar’s affidavit, which Magellan appears to have filed as
part of its first appeal of the lower court’s order requiring Magellan’s
business to be wound up, illuminated the extent of the dispute between the
parties, stating,

          It is
apparent that there are significant differences between the parties.  They are
in effect of at least two types.

 

(1)     First there
are issues regarding the principles on which [New Hampshire] has produced its
Cession Statements and the appropriate sums that ought to be included within
them.  These include questions regarding the extent of [New Hampshire’s]
discretion to charge its costs against premiums and to determine the level of
unearned premium reserve.

 

(2)     Secondly,
there is the question of whether under the Reinsurance Agreement the parties
intended that Magellan, when faced with a payment demand which could only be
validated by an audit of the Petitioner’s records under Art XI, would in effect
be barred from challenging that demand unless it had exercised its audit right
within two calendar quarters of service of the demand by the Petitioner.

 

                    . . . .

 

          I am
advised that [the] winding up procedure ought not to be used for claims other
than genuinely undisputed debts and claims where, though there is a dispute, the
dispute can be shown easily and quickly to be not genuine in the sense of being
groundless.  I would submit that it is apparent from what I say above that here
there is a real dispute which is still unresolved after months of detailed
argument by myself and, on [New Hampshire’s] behalf, Ms. Cheshire.

 

          It is
moreover a dispute of a type which the parties have agreed should be dealt with
by arbitration and which is particularly suitable for arbitration.

 

And
particularly telling is the judgment of the Lords of the Judicial Committee of
the Privy Council.  Even though the limited issue before the high court concerned
New Hampshire’s status as a “creditor,” the judgment includes approximately
five single-spaced pages of excerpts from the Reinsurance Agreement.  Given
that New Hampshire’s and Magellan’s relationship is governed by the Reinsurance
Agreement, it is no surprise that the high court chose to begin its analysis by
extensively referencing the Reinsurance Agreement’s terms.

          In
the New York proceeding, New Hampshire persisted in its characterization of the
dispute as one not involving the interpretation of the Reinsurance Agreement, but
in doing so, it simultaneously observed that the dispute involved Magellan’s
failure to deposit funds into a trust account “as required by the Reinsurance
Agreement.”  [Emphasis added.]  Thus, even when narrowly characterizing the
scope of the dispute before the New York court, New Hampshire could not escape
the significance of the Reinsurance Agreement as it pertained to New
Hampshire’s relationship and dispute with Magellan.

          And
finally, although Magellan has amended its petition several times, its claims
in the Texas litigation—whatever label they have been given—have consistently
implicated an interpretation of the terms of the Reinsurance Agreement.  Cf.
Jack B. Anglin Co., 842 S.W.2d at 271 (reasoning that we focus on the
factual allegations of the complaint, rather than the legal causes of action
asserted, when determining whether claim falls within the scope of an
arbitration agreement).

          A
thorough review of the record thus reveals this:  Neither New
Hampshire’s varying characterizations of the proceedings nor the labels
attached to the claims alleged by Magellan in its petitions define the essence
of the dispute between New Hampshire and Magellan.  The dispute has always centered
around, and continues to entail, each party’s rights and duties and compliance
or noncompliance under the Reinsurance Agreement.  On more than one occasion, in
one form or another, New Hampshire has argued against the arbitrability of this
dispute.  Its conduct has been overwhelmingly inconsistent with its present
attempt to compel arbitration.  Accordingly, in light of all the foregoing, we cannot
agree with New Hampshire’s overriding argument that it has never challenged the
arbitrability of the claims alleged by Magellan in its second amended petition.

          We
hold that New Hampshire is judicially estopped from compelling arbitration and,
therefore, that the trial court did not abuse its discretion by denying New
Hampshire’s motion to compel arbitration.  We overrule New Hampshire’s sole
issue.

V.  Conclusion

          Having overruled New
Hampshire’s only issue, we affirm the trial court’s order denying New
Hampshire’s motion to compel arbitration.

 

 

 

BILL MEIER
JUSTICE

 

PANEL: 
GARDNER,
MCCOY, and MEIER, JJ.

 

DELIVERED:  February 14, 2013









[1]See Tex. R. App. P. 47.4.





[2]This court has also
previously issued a memorandum opinion addressing New Hampshire’s arguments
that Magellan failed to comply with the requirements for recognition of foreign
country judgments under the Uniform Foreign Country Money-Judgment Recognition
Act.  See New Hampshire Ins. Co. v. Magellan Reinsurance Co., No.
02-11-00334-CV, 2013 WL 105654, at *1 (Tex. App.—Fort Worth Jan. 10, 2013, no
pet.) (mem. op.).  Nothing in that opinion conflicts with our holding in
this memorandum opinion.





[3]Whether the Federal
Arbitration Act (FAA), Texas Arbitration Act, or both apply is not at issue in
this appeal, nor does it affect our analysis or jurisdiction.